[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 12, 2007
THOMAS K. KAHN
CLERK

No. 06-11769

_____

D. C. Docket No. 04-00367-CV-T-17-MSS

MICHAEL D. PORTER,

Plaintiff-Appellant,

versus

BOB WHITE,
in his official capacity as Sheriff of Pasco County,
JAMES GARY FAIRBANKS,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(April 12, 2007)**

Before ANDERSON and MARCUS, Circuit Judges, and ALTONAGA,[*] District
Judge.

ANDERSON, Circuit Judge:

_____

[*] Honorable Cecilia M. Altonaga, United States District Judge for the Southern District of
Florida, sitting by designation.

In 1988, Michael D. Porter was convicted of burglary, kidnapping, robbery, aggravated battery, and sexual battery in Pasco County, Florida. He was sentenced to life in prison without the possibility of parole. In 2002, we granted Porter's petition for habeas corpus and set aside his conviction after concluding that the prosecution had violated his due process rights under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), by failing to disclose to him, for use at trial, two favorable police reports, both of which were material to his defense. Porter v. Moore, No. 01-12311 (11th Cir. Feb. 4, 2002) (unpublished). Later in 2002, this time equipped with the previously undisclosed reports, Porter was retried and acquitted of all charges.

In 2004, Porter filed this §1983 damages action against James G. Fairbanks, the former Pasco County investigator who he alleges withheld from the State Attorney's Office the undisclosed police reports, thereby depriving Porter of his Fourteenth Amendment due process right to a fair trial.[1] In addition to his individual-capacity claim against Fairbanks,[2] Porter alleges two official-capacity

_____

[1] Although Porter's complaint erroneously invokes the Due Process Clause of the Fifth Amendment, we will refer throughout this opinion to the Due Process Clause of the Fourteenth Amendment, because Porter was prosecuted in state court and because his claims in this suit are against a non-federal government official and a non-federal governmental entity.

[2] Porter also originally sued Fairbanks in his official capacity. The parties stipulated to the dismissal of the official-capacity claim in the district court.

claims against Bob White, the former Pasco County Sheriff. The claims against White assert that the county is liable in damages under §1983 for inadequately training Fairbanks and other sheriff's department employees in the proper methods of disclosing Brady material, and that the county is similarly liable for maintaining a custom or policy of not disclosing Brady material, which caused Fairbanks to violate Porter's due process rights.

Following discovery, the parties filed cross-motions for summary judgment. Fairbanks and White moved separately for summary judgment as to all claims. Porter moved for summary judgment only on his claim against Fairbanks. Denying Porter's motion and granting summary judgment in favor of Fairbanks and White, the district court concluded that Fairbanks was entitled to qualified immunity on Porter's due process claim (because Fairbanks did not violate a "clearly established" right) and that Porter had failed to create a genuine issue of material fact on his claims against White. Porter appeals. Concluding that Porter's due process claim fails on the merits, we affirm.

## I.  BACKGROUND

Just before midnight on June 26, 1987, Morton Young was brutally attacked and raped in her room at the LaRue Motel in Holiday, Florida. Following the attack, Young made her way to a nearby gas station to seek help. William

Karcinski and Sandy Nicholas were dispatched to the gas station in response to a call from the station attendant — at the time, Karcinski was a recently hired deputy sheriff with the Pasco County Sheriff's Office, and Nicholas was his field training officer. Karcinski and Nicholas were the first law enforcement officials to respond. According to Karcinski, Young was "crying, nervous, [and] upset." Karcinski interviewed Young at the gas station. He asked her if she could provide a description of her attacker and if she could recount the manner in which she had been attacked. She did both. Karcinski recorded Young's statements in a written incident report.

Karcinski's report reveals that Young was watching television in her bedroom around 11:30 p.m. when she heard a noise coming from the kitchen/living room area. She got up to investigate and was confronted by a man who wrapped a belt around her neck and spun her around so she could not see his face. Telling her to keep quiet, the man laid Young down on her stomach and said, "I bet you didn't know I was going to do this. I've been watching you." The man tightened the belt around Young's neck, dragged her from room to room throughout the unit, and tried repeatedly to have sex with her. After several failed attempts to obtain an erection, the man finally succeeded and proceeded to rape Young while she was submerged in a bathtub half filled with water. When he was finished, the man told

4

Young to lie face down on the couch because he was "going to take her money and leave." Young stayed on the couch for approximately half an hour before going to the gas station for help.

Despite her view having been partially obscured during the attack, Young was able to give Karcinski the following description of her attacker, which Karcinski recorded in his report — Race: White. Age: 38-40. Height: 5'7"-5'9". Weight: 150 lbs. Hair: Dark. Eyes: Unknown. Build: Thin. Young told Karcinski that her attacker had been wearing blue jeans and an unknown type shirt.

Rather than going to the LaRue Motel to view the scene of the attack, Karcinski and Nicholas accompanied Young to the local hospital. At the hospital, they met the lead investigator assigned to the case, James G. Fairbanks. Fairbanks also worked for the Pasco County Sheriff's Office. Karcinski proceeded to tell Fairbanks all of the information he had learned from Young. Karcinski says he informed Fairbanks of Young's description of the attacker during their initial conversation. Karcinski did not provide Fairbanks a copy of his written report at the hospital, however, because it was not yet complete and because it had not been approved by Karcinski's supervisor. Fairbanks does not remember Karcinski giving him a description of Young's attacker at the hospital. Fairbanks says he first learned of the description Young gave Karcinski when he received Karcinski's

report on June 28.

After speaking to Karcinski and Nicholas, Fairbanks interviewed Young while still at the hospital. Young recounted the details of the attack. She told Fairbanks that she could not provide a description of her attacker's face, but she was able to give him a general physical description. According to Fairbanks, Young stated that her attacker was a white male, 6'1" in height, weighed 150 lbs., had dark wavy hair, and appeared to be in his late 30s. Fairbanks recorded Young's statements in a written report dated July 7, 1987.

Following their meeting with Fairbanks at the hospital, Karcinski and Nicholas were sent to the LaRue Motel to monitor the scene of the crime. There, they encountered Pasco County deputy sheriff Thomas Hendrickson, who had been dispatched to the motel shortly after the attack was reported. While securing the scene upon his arrival at the motel, Hendrickson observed a Marlboro cigarette lying on the floor of the kitchen in the unit where Young had been attacked. He later conducted a sweep of the area surrounding the crime scene and spoke to a handful of individuals. One of the individuals with whom Hendrickson spoke was Tony Hawkins. Hawkins, whom Hendrickson observed smoking a Marlboro cigarette, told Hendrickson that he had come to the motel at approximately 1:30 a.m. to visit his friend Robert George, who lived there. Hawkins and George were

6

sitting at an outdoor table having a beer when Hendrickson encountered them. Hendrickson also spoke to George. Neither Hawkins nor George was able to relate any information Hendrickson considered particularly useful to the investigation.

Hendrickson summarized in a written report his conversations with George, Hawkins, and two other individuals present at the motel. Included in Hendrickson's report was the following description of Hawkins: Born in 1944; 5'9" in height; 160 lbs.; brown hair; blue eyes. Hendrickson also recorded the fact that Hawkins smoked Marlboro cigarettes. At the time he spoke with these four individuals, Hendrickson was aware of the description Young had given Karcinski at the gas station. Hendrickson recognized that, while similar, the description of Hawkins and the description of the attacker Young had provided Karcinski were not identical. The descriptions were not similar enough to make Hendrickson suspect that Hawkins was the attacker. Had his suspicions been raised, Hendrickson says, he "would have immediately contacted the case detective and made sure he stuck around." According to the sheriff department policy in place at the time, Hendrickson would have been required to complete his report and place it in a box for his sergeant's approval by the end of his shift. From there, the report would have been forwarded to the lead detective on the case, Fairbanks.

Fairbanks received Hendrickson's report on June 28, the same day he

received Karcinski's. Fairbanks had an opportunity at this point to gauge the similarities and differences between the two descriptions Young gave of her attacker and the description of Hawkins recorded by Hendrickson. Fairbanks conducted a follow up interview with Young three or four days after the attack. During this interview, Young and the manager of the LaRue Motel gave Fairbanks the name of Michael Porter as someone who should be investigated. Porter's name surfaced after the motel manager had reviewed the guest records and determined that Porter and his wife, Susan, who were going through a bitter separation, had stayed at the motel shortly before the attack. Given the confirmation of his presence at the motel just days before June 26, Porter quickly became a target of the investigation because, according to Karcinski's report, Young's attacker had said to her, "I bet you didn't know I was going to do this. I've been watching you." Young never suggested to Fairbanks that she thought Hawkins was the one who attacked her.

Fairbanks informed Susan that her husband was being investigated as a suspect in the June 26 attack. Fairbanks and Susan met or spoke on the telephone several times. During one of their first discussions, Susan told Fairbanks that Porter had a propensity for engaging in violent sex and that, at times, she feared for her physical safety. Fairbanks took no steps to corroborate Susan's allegations.

Fairbanks homed in on Porter as a potential suspect even more intently after Susan, during one of her discussions with Fairbanks, reported that Porter had taken credit for the June 26 attack and had confessed specific details about it. According to Susan, Porter told her in mid-August that the attack at the motel was fueled by his anger at Susan for separating from him. He further stated that he broke into the motel intending to kill a woman. When he learned of Porter's statements, Fairbanks thought that the crime-related facts Porter divulged to Susan were facts that could have been known only to the attacker. Fairbanks was unaware at the time he spoke to Susan that a local newspaper had published a story containing many details of the attack shortly after June 26.

At some point during the investigation, Fairbanks entered Porter's name into a computer database of criminal offenders and discovered information about an unsolved crime in which a white male had attempted to climb through the window of a young woman's apartment, but was chased off by the woman's screams for help. The victim of the burglary identified a nearby neighbor as the perpetrator. The neighbor's name was Michael Porter. The victim filed a police report describing the incident. Her description included the fact that a belt was found on the balcony underneath her apartment window. Recognizing the similarity between the two attacks, Fairbanks attempted unsuccessfully to locate the victim who had

9

filed the police report. He was not able to determine whether the Michael Porter he was investigating for the LaRue Motel attack lived near the victim of the earlier crime at the time it occurred.

After a nearly three month investigation, Fairbanks arrested Porter on September 24, 1987. In his arrest report, Fairbanks listed Porter as 6'1" in height, stated that he was born in 1960, that he weighed 170 lbs., and that he had blue eyes and black hair. This physical description was not radically different from the description Young had given Fairbanks in the hospital on the night of the attack, although it did differ substantially from the description Young gave Karcinski at the gas station and from the description of Tony Hawkins contained in Hendrickson's report.

Porter was brought to trial on August 15, 1988. Declan Mansfield prosecuted the case on behalf of the State Attorney's Office. Assistant Public Defender Stephen Dehnart represented Porter. Dehnart was not very familiar with the case, however. He had inherited it only three or four weeks before trial after Porter's original attorney, Assistant Public Defender Michael McMillan, who had handled pretrial discovery, was forced to step aside due to a serious viral infection that resulted in a coma lasting three or four months. McMillan testified in his deposition in this case that his illness in 1988 disrupted the orderly discovery

process. McMillan did not keep a list chronicling which police reports he received.

McMillan does not remember receiving either the Karcinski or the Hendrickson

report during the time he represented Porter. Dehnart likewise did not have either

the Karcinski or the Hendrickson report during the 1988 trial. Porter was

convicted. Two months later, he was sentenced to life in prison without the

possibility of parole.

As the lead investigator on the case, it was Fairbanks's obligation to ensure

that all police reports prepared in connection with the investigation were turned

over to the State Attorney's Office. Fairbanks acknowledged his responsibility,

testifying in a deposition for this case: "Back then, I don't know what the State

Attorney's Office obligation was. And that wasn't my job to know what their

obligation was. But I had an obligation to furnish them with the reports, which I

did. Yes, sir." While Fairbanks cannot recall what the procedure was in 1988 for

forwarding police reports to the State Attorney's Office, he is confident he

complied with it:

> [I]t was my responsibility to get the reports together and send them
> over . . . and I don't recall whether I hand-carried them to the front
> desk at the State Attorney's Office or . . . whether I took [them] over
> [when] we were having an invest,[3] or whether there was a box in the

---

[3] An "invest" is a meeting between the law enforcement officers handling an investigation and the prosecutor, at which time a decision is made regarding whether the State will file charges

11

office. I just don't remember exactly what the procedure was. But I know I followed the procedure. I always followed the procedure, and [had] no reason not to.

Fairbanks never followed up with the State Attorney's Office to see whether the reports were actually received. Fairbanks cannot say for certain whether the reports were in Mansfield's file before or during the 1988 trial. His uncertainty notwithstanding, Fairbanks testified that the State Attorney's Office must have received the reports before the invest proceeding was held because, if Mansfield had not had copies of the "original reports of the offense" during the invest, he would have "jumped all over me" and "eaten me alive." Mansfield did neither.

Mansfield has no specific recollection of either of the reports. Mansfield testified, however, that he habitually turned over to the defense all police reports he received. He testified that if the defense failed to get a particular report, it must have been because the report was never received in the State Attorney's Office. Mansfield's practice in 1987-1988 was to turn over to defense attorneys all police reports, so long as the reports were "connected to the case." According to Mansfield, the State Attorney's Office maintained no record-keeping system to track which reports were turned over to the defense in a given case and which ones were not. Mansfield testified that police reports "would be handed over at some

_____

against the subject of the investigation.

point" by the appropriate officer, but that "I'm not quite sure how it got into our file because it went to a secretary who would put it in a file and then you would at some point get it. It wasn't handed to you personally." Mansfield admitted, however, that police reports were, on occasion, inadvertently left out of discovery packets sent to defense counsel. In fact, when asked at his deposition whether this ever happened, Mansfield responded: "Absolutely. Absolutely."

In 1994, in connection with a federal habeas petition filed by Porter, Charles Fulgieri, an investigator with the Federal Public Defender's Office, began looking into the circumstances surrounding Porter's conviction. As part of his investigation, Fulgieri traveled to the Dade City location of the Pasco County Sheriff's Office where he was told that records from the Porter case were being stored. Fulgieri was given a packet of documents. Included in the packet were the Fairbanks report, the Hendrickson report, the Karcinski report, and a report prepared by a crime scene technician. Shortly after receiving these documents, Fulgieri went to review the Porter file in the state public defender's office. According to Fulgieri, the state file contained no police reports at all — not even Fairbanks's report, which Porter has never alleged was withheld from the prosecution or the defense.

Fulgieri tried to speak with Fairbanks about the matter, but Fairbanks refused

13

to speak to him without the presence of an Assistant United States Attorney. Fulgieri never spoke with Karcinski, Hendrickson, or Mansfield. Denhart refused to speak with Fulgieri. McMillan, who did speak with Fulgieri, could not provide any information about the reports.

On the basis of the information learned by Fulgieri, Porter added to his federal habeas petition an allegation that the State violated his due process rights under Brady when it failed to turn over the Karcinski and Hendrickson reports. After Porter exhausted his Brady claim in state court, the district court rejected the claim on the merits. The district court determined that the reports were favorable to Porter's defense and were suppressed by the prosecution, but that they were not "material" for Brady purposes because there was not "a reasonable probability that the result of this trial would have been different" if they had been disclosed. The district court denied Porter's habeas petition. On appeal, Porter challenged the district court's rejection of his Brady claim. We concluded that the reports were material, reversed the district court, and granted Porter's habeas petition. On retrial, in 2002, Porter was acquitted of all charges.

In 2004, Porter filed this §1983 action, alleging that "James Gary Fairbanks illegally and wrongfully suppressed material exculpatory evidence in violation of Plaintiff's rights under the [Fourteenth] Amendment to the United States

Constitution." Compl. ¶1. Also, as we noted at the outset, Porter alleged two claims against Sheriff White. The district court granted summary judgment in favor of Fairbanks and White. Porter appeals.

## II. STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment, applying the same standards that bound the district court and viewing the evidence and all reasonable inferences in the light most favorable to the non-moving party. See Drago v. Jenne, 453 F.3d 1301, 1305 (11th Cir. 2006). "Summary judgment is appropriate when 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'" Id. (quoting Fed.R.Civ.P. 56(c)).

## III. DISCUSSION

The district court held that Fairbanks was entitled to qualified immunity on Porter's due process claim, concluding that Fairbanks had not violated a "clearly established" principle of constitutional law; namely, the due process principle that forbids police from intentionally withholding Brady material from prosecutors. Fairbanks urges us to affirm the district court's qualified-immunity determination because, as of 1988, the time at which Fairbanks is alleged to have violated Porter's Fourteenth Amendment rights, the only relevant due process principle

15

"clearly established" by binding precedent was that police officers could not *intentionally* withhold from prosecutors material evidence favorable to the defense — conduct that Fairbanks says Porter cannot prove. See McMillian v. Johnson, 88 F.3d 1554, 1569 (11th Cir. 1996) ("Our case law clearly established [as of 1987 and 1988] that an accused's due process rights are violated when the police conceal exculpatory or impeachment evidence"). Porter, on the other hand, who reads our decision in McMillian more broadly, urges us to reverse the district court's qualified-immunity determination because, in his view, McMillian stands for the proposition that, as of 1988, the due process clause prohibited *any* failure on the part of police officers to disclose to prosecutors material evidence favorable to the defense — whether an officer acted intentionally, negligently, or blamelessly. Porter also argues that, even if his reading of McMillian is mistaken, he has produced "ample circumstantial evidence" to show that Fairbanks "more likely than not intentionally withheld the two missing reports from the prosecutor." For the reasons set forth below, we conclude that Porter's due process claim fails on the merits of the constitutional question. This conclusion, of course, moots the "clearly established" inquiry.

When confronted with a government official's invocation of qualified immunity, we have been instructed by the Supreme Court to first decide the

16

threshold issue — before addressing whether the particular right was "clearly established" at the time it was allegedly violated — of whether the official has deprived the plaintiff of a constitutional right at all. See Brosseau v. Haugen, 543 U.S. 194, 197, 125 S. Ct. 596, 598 (2004); Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001) ("insisting [that courts] turn[] to the existence or nonexistence of a constitutional right as the first inquiry"); Wilson v. Layne, 526 U.S. 603, 609, 119 S. Ct. 1692, 1697 (1999) ("A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all . . . .'") (citations omitted); Conn v. Gabbert, 526 U.S. 286, 290, 119 S. Ct. 1292, 1295 (1999); County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5, 118 S. Ct. 1708, 1714 n.5 (1998); Siegert v. Gilley, 500 U.S. 226, 232, 111 S. Ct. 1789, 1793 (1991). We proceed to the "clearly established" prong of the qualified-immunity inquiry — the prong on which Fairbanks and Porter have focused — only "[i]f a constitutional right would have been violated under the *plaintiff's* version of the facts." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002); see Saucier, 533 U.S. at 201, 121 S. Ct. at 2156 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity").

17

Given the Supreme Court's insistence that we resolve assertions of qualified immunity in this manner, we first determine the merits of Porter's claim — whether he has produced evidence from which a reasonable juror could conclude that Fairbanks's conduct deprived him of a right guaranteed by the Due Process Clause. Our first task is to examine the right alleged to have been violated by Fairbanks. See Lewis, 523 U.S. at 841 n.5, 118 S. Ct. at 1714 n.5 ("As in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated"); see also Baker v. McCollan, 443 U.S. 137, 140, 99 S. Ct. 2689, 2692 (1979) ("The first inquiry in any § 1983 suit" is "to isolate the precise constitutional violation with which [the defendant] is charged").

As noted at the outset, we have already held that Porter's procedural due process right to a fair trial was violated in 1988.[4]  See Porter v. Moore, No. 01-12311 (11th Cir. Feb. 4, 2002) (unpublished).  Specifically, we held that Porter's right under Brady to receive evidence favorable to his defense, evidence that in

---

[4] The right protected by the Brady rule is "the defendant's right to a fair trial mandated by the Due Process Clause of the [Fourteenth] Amendment to the Constitution." United States v. Agurs, 427 U.S. 97, 107, 96 S. Ct. 2392, 2399 (1976); see Grayson v. King, 460 F.3d 1328, 1337 (11th Cir. 2006) ("The Brady rule is grounded in a defendant's right to a fair trial").  The right to a fair trial, in turn, stems from the procedural sphere of the Due Process Clause. See Daniels v. Williams, 474 U.S. 327, 337, 106 S. Ct. 677, 678 (1986) (The Due Process Clause of the Fourteenth Amendment contains "a guarantee of fair procedure, sometimes referred to as 'procedural due process': the State may not . . . imprison . . . a defendant without giving him a fair trial") (Stevens, J., concurring).

Porter's case had both exculpatory and impeachment value, was violated "when the prosecutor withheld favorable police reports from Porter's defense counsel." Id. at 3. We held that the undisclosed reports were material for Brady purposes because Porter had "shown a reasonable probability that the result of the trial would have been different if the police reports had been produced and available." Id. at 4. Our determination that Porter's procedural due process rights were violated by the prosecution's failure to observe its Brady obligations therefore caused us to grant Porter's petition for habeas corpus and set aside his conviction. Porter maintains in the present suit that Fairbanks caused the underlying Brady violation and that his conduct in causing that due process violation makes him properly liable for damages under §1983.

Our discussion of Porter's claim against Fairbanks proceeds in three parts. First, we note that it remains an open question in this Circuit whether the procedural due process violation that resulted from the prosecution's nondisclosure of Brady material is the same constitutional violation that subjects Fairbanks to civil liability under § 1983 or whether Porter's claim against Fairbanks is predicated on an independent due process violation. See Jean v. Collins, 221 F.3d 656, 659 (4th Cir. 2000) (en banc) (Wilkinson, C.J., concurring) (noting, on similar facts, that "[t]he question before us now is whether there was an *additional*

19

constitutional violation in this case") (emphasis added). Second, we consider whether an official in Fairbanks's position, whose conduct allegedly caused a Brady violation, can be said to have caused a constitutional deprivation if his conduct is no more than merely negligent. Third, we consider whether there is evidence in this case from which a reasonable juror could conclude that Fairbanks is liable under § 1983 for violating Porter's due process rights.

### A. Porter's Claim Against Fairbanks in this § 1983 Action for Damages

In McMillian, a §1983 action against law enforcement officials that involved allegations similar to Porter's, we stated that "§ 1983 provides a cause of action for a violation of the due process right to a fair trial that is protected by Brady." 88 F.3d at 1567 n.12. After various Brady violations caused his murder conviction and death sentence to be set aside on appeal, McMillian sued several law enforcement officials who he alleged "suppressed and withheld exculpatory and impeachment evidence in violation of [McMillian's] due process rights under the Fourteenth Amendment." Id. at 1560. Treating the underlying Brady violation as the basis for McMillian's allegations against the law enforcement officials, the district court denied qualified immunity to three of the officials, holding that McMillian had created a genuine issue of material fact on the question of whether

20

the officials "intentionally withheld several pieces of exculpatory and impeachment evidence from the . . . prosecutor." Id. at 1566. The district court further determined that a law enforcement official's intentional withholding of Brady material from a prosecutor was prohibited by clearly established due process principles at the time of the alleged withholding. Id. On the officials' interlocutory appeal, we accepted as true McMillian's allegations of intentional withholding[5] and, in the process of considering whether the officials violated McMillian's clearly established due process rights, we recognized that a handful of courts had permitted Brady-type due process claims to be pursued against law enforcement officials under §1983. Id. at 1567 n.12. We agreed and held that, under §1983, a plaintiff may assert a due process claim for money damages against a police officer. Id. Thus, McMillian establishes Porter's right to pursue this §1983 action for

---

[5] Because of the interlocutory posture of the appeal, and because the district court had concluded that McMillian adduced sufficient evidence to create a genuine issue of fact regarding whether the officials' conduct was intentional, we proceeded directly to the purely legal question presented by the "clearly established" prong of the qualified-immunity analysis. In other words, we did not have occasion to determine the appropriate level of culpability necessary to state the sort of due process claim McMillian asserted. As to McMillian's due process claim against the officials, we simply assumed that the officials acted intentionally and noted for qualified-immunity purposes that *if* the officials *intentionally* withheld what they knew to be Brady material, *then* they violated clearly established law. Our decision in McMillian, therefore, left open the question of whether less-than-intentional conduct would suffice to establish a Brady-type due process claim against law enforcement officials.

damages against Fairbanks.[6]

It is unnecessary in this case to determine whether Porter's claim sounds in procedural or substantive due process.[7] That is because, as discussed below, we would reach the same result using the same analysis regardless of how the claim is characterized.

B.   The Level of Culpability Necessary to
Subject a Law Enforcement Official to §1983
Liability for Causing a Brady Violation

In the criminal or habeas context, a prosecutor's culpability is irrelevant for purposes of demonstrating a procedural due process violation based on a Brady nondisclosure.[8] That is, a defendant establishes a Brady violation in the criminal or

_____

[6] Although the statute of limitations for § 1983 claims arising in Florida is four years, see Chappell v. Rich, 340 F.3d 1279, 1283 (11th Cir. 2003), Porter's due process claim against Fairbanks is not time-barred, because, under Heck v. Humphrey, 512 U.S. 477, 489-90, 114 S. Ct. 2364, 2374 (1994), his § 1983 cause of action, seeking as it does damages to redress time spent in prison following conviction at a constitutionally deficient trial, did not accrue until we vacated his conviction in 2002. Id. ("[A] § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated"). Porter's § 1983 suit for damages, filed in 2004, is thus timely.

[7] While the "procedural" versus "substantive" due process distinction does not affect the outcome of this case, it might, in a future case, be significant in light of Parratt v. Taylor, 451 U.S. 527, 101 S. Ct. 1908 (1981), overruled in part by Daniels, 474 U.S. at 330-31, 106 S. Ct. at 664, and Zinermon v. Burch, 494 U.S. 113, 110 S. Ct. 975 (1990).

[8] Injury flowing from a procedural due process violation (i.e., incarceration following a constitutionally unfair trial) that results from a prosecutor's failure to comply with the Brady rule cannot be redressed by a civil damages action against the prosecutor under §1983 because the prosecutor is absolutely immune from such liability. See Imbler v. Pachtman, 424 U.S. 409, 427, 430, 96 S. Ct. 984, 993, 995 (1976) (prosecutors entitled to absolute immunity from suit when engaged in "activities . . . intimately associated with the judicial phase of the criminal process,"

22

habeas context whenever he can show that favorable evidence material to his case was not disclosed to the defense, "*irrespective of the good faith or bad faith* of the prosecution."  Brady, 373 U.S. at 87, 83 S. Ct. at 1197 (emphasis added); see Strickler v. Greene, 527 U.S. 263, 288, 119 S. Ct. 1936, 1952 (1999) ("[U]nder Brady an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment"); Agurs, 427 U.S. at 110, 96 S. Ct. at 2401 ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor").  The Brady rule thus imposes a no-fault standard of care on the prosecutor.  If favorable, material evidence exclusively in the hands of the prosecution team fails to reach the defense — for whatever reason — and the defendant is subsequently convicted, the prosecution is charged with a Brady violation, and the defendant is entitled to a new trial.  It is this no-fault standard of care that Porter says should apply to Fairbanks in this §1983 suit for damages.  While Porter alleges alternatively that Fairbanks's failure to disclose was intentional, he nevertheless argues that intent does not matter because Fairbanks may be held liable in damages regardless of his

---

even though, in some instances, "this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty"); see also Broam v. Bogan, 320 F.3d 1023, 1030 (9th Cir. 2003) (prosecutor's failure to comply with Brady rule involves "an exercise of the prosecutorial function and entitles [him] to absolute immunity from a civil suit for damages"); Long v. Satz, 181 F.3d 1275, 1279 (11th Cir. 1999); Fullman v. Graddick, 739 F.2d 553, 558-59 (11th Cir. 1984).

culpability. Porter Br. at 21 ("Since Brady claims do not contain a subjective component, whether Detective Fairbanks acted intentionally is irrelevant").

To support his argument that a no-fault standard of care should apply to Fairbanks in the §1983 context, Porter reasons as follows: (1) a Brady violation is a due process deprivation; (2) Brady may be violated without regard to culpability; (3) McMillian holds that such a due process deprivation may be redressed under §1983; (4) §1983 contains no state-of-mind requirement independent of that necessary to violate the underlying constitutional provision; (5) Fairbanks caused the underlying Brady violation; and thus (6) under §1983, Fairbanks may be held liable for a due process deprivation without regard to his culpability. We disagree. We reject this reasoning as inconsistent with Supreme Court precedent. We hold that the no-fault standard of care Brady imposes on prosecutors in the criminal or habeas context has no place in a §1983 damages action against a law enforcement official in which the plaintiff alleges a violation of due process.

Porter's argument is reduced to the following proposition: because the Supreme Court in Brady held that a due process violation occurs without regard to good or bad faith, and because Porter has asserted a Brady claim, he should not be required to show that Fairbanks acted with any level of culpability. The flaw in Porter's argument is that his claim is *not* a pure Brady claim. As our McMillian

24

opinion pointed out, the constitutional duty described by Brady and its progeny —

the duty to disclose favorable, material evidence to the defense — is imposed on

the *prosecutor*.  See Jean, 221 F.3d at 660 (Wilkinson, C.J., concurring) (stating

that "to speak of the duty binding police officers as a Brady duty is simply

incorrect," and pointing to Supreme Court cases placing the duty upon the

prosecution; Brady, 373 U.S. at 87, 83 S. Ct. at 1197; Giglio v. United States, 405

U.S. 150, 154, 92 S. Ct. 763, 766 (1972); Moore v. Illinois, 408 U.S. 786, 794, 92

S. Ct. 2562, 2568 (1972); Agurs, 427 U.S. at 108, 96 S. Ct. at 2400; United States

v. Bagley, 473 U.S. 667, 675-76, 105 S. Ct. 3375, 3379-80 (1985); Kyles v.

Whitley, 514 U.S. 419, 437-38, 115 S. Ct. 1555, 1567-68 (1995)).  Although our

binding precedent in McMillian establishes that the correlative duty on the part of

law enforcement officials is to turn over exculpatory evidence to the prosecution,

88 F.3d at 1567, neither McMillian nor any other binding precedent[9] elaborates on

the scope of that duty.  For example, although McMillian did hold that the law was

clearly established as of 1987 and 1988 that a police officer had a duty not to

intentionally withhold exculpatory evidence from the prosecution, id. at 1568-69,

the opinion did not address whether less-than-intentional conduct on the part of a

---

[9] See Jean, 221 F.3d at 659 (Wilkinson, C.J., concurring) (discussing the case law extant as of 2000).

police officer would violate the duty. See supra n.5.

Thus, it is for the alleged breach of this correlative duty — Fairbanks's duty as a law enforcement official to turn over exculpatory evidence to the prosecution — and the loss of liberty resulting therefrom, that Porter must be deemed to be seeking compensation in this case. We address as a matter of first impression whether Porter must demonstrate that Fairbanks acted with a level of culpability consisting of more than mere negligence.[10]

Porter's allegation in this §1983 action — that Fairbanks's failure to disclose the police reports to the prosecution caused the denial of his due process right to a fair trial — amounts to an allegation that Fairbanks committed a constitutional tort. See 42 U.S.C. §1983 ("Every person who, [under color of state law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution . . . shall be liable to the party injured"); see also Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 305-06, 106 S. Ct. 2537, 2542 (1986) ("We have repeatedly noted that 42 U.S.C. §1983 creates a species of tort liability in favor of persons who are deprived of rights, privileges, or

_____

[10] In addition to showing breach and injury, Porter must, to prevail on his § 1983 claim, demonstrate that Fairbanks caused the constitutional deprivation. See Troupe v. Sarasota County, 419 F.3d 1160, 1165 (11th Cir. 2005) ("A §1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation"); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692, 98 S. Ct. 2018, 2036 (1978) ("Congress did not intend § 1983 liability to attach where [] causation [i]s absent").

26

immunities secured to them by the Constitution") (citations and internal quotation marks omitted); <u>City of Monterey v. Del Monte Dunes at Monterey, Ltd.</u>, 526 U.S. 687, 727, 119 S. Ct. 1624, 1647 (1999) ("There is no doubt that the cause of action created by §1983 is, and was always regarded as, a tort claim") (Scalia, J., concurring). This is reflected in part by the nature of the relief Porter seeks in his complaint — monetary compensation sufficient to make him whole for the years he spent in prison following his 1988 conviction. <u>See</u> Compl. ¶1 ("This is an action for damages to compensate Michael D. Porter for the fifteen years he spent in Florida jails and prisons after he was . . . wrongfully convicted"); <u>see</u> <u>Stachura</u>, 477 U.S. at 306-07, 106 S. Ct. at 2542-43 ("Punitive damages aside, damages in tort cases are designed to provide *compensation* for the injury caused to plaintiff by defendant's breach of duty" and "Congress adopted this common-law system of recovery when it established liability for constitutional torts;" thus, "the basic purpose of §1983 damages is to *compensate persons for injuries* that are caused by the deprivation of constitutional rights") (citations and internal quotation marks omitted).

Not every action by a state actor that results in a loss of liberty under the Due Process Clause gives rise to liability under §1983. The Supreme Court, addressing the question of "when tortious conduct by state officials rises to the level of a

constitutional tort" for purposes of an alleged due process violation, held in

Daniels v. Williams that "the Due Process Clause is simply not implicated by a

*negligent* act of an official causing unintended loss of or injury to life, liberty, or

property." 474 U.S. 327, 328, 106 S. Ct. 662, 663 (1986). In so holding, the Court

in Daniels partially overruled its decision in Parratt v. Taylor, 451 U.S. 527, 101

S. Ct. 1908 (1981), to the extent that Parratt had recognized negligent conduct as

sufficiently culpable to constitute a deprivation under the Due Process Clause.

474 U.S. at 330-31, 106 S. Ct. at 664. The Court reiterated that § 1983 "contains

no state-of-mind requirement independent of that necessary to state a violation of

the underlying constitutional right." Id. at 330, 106 S. Ct. at 664.

Because the source of the underlying right allegedly violated in Daniels was

the Due Process Clause, the Court looked to its text — "[N]or shall any State

deprive any person of life, liberty, or property, without due process of law" — to

determine whether that constitutional provision mandated a particular level of

culpability as a prerequisite for liability. The Court noted that "the word 'deprive'

in the Due Process Clause connote[s] more than a negligent act," which, the Court

stated, explains why the guarantee of due process has historically "been applied to

*deliberate* decisions of government officials." Id. at 330, 331, 106 S. Ct. at 664,

665 (emphasis in original). Emphasizing the point that mere negligent conduct

does not "wor[k] a deprivation in the *constitutional sense*," id. at 330, 106 S. Ct. at 664 (alteration and emphasis in original), the Court has since stated, citing Daniels, that "the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." Lewis, 523 U.S. at 849, 118 S. Ct. at 1718.

As noted above, we find it unnecessary in this case to determine whether Porter's claim sounds in procedural or substantive due process. This is so in part because our conclusion regarding the level of culpability necessary to sustain a due process claim seeking damages against a state official is not dependent on the characterization of Porter's claim. In Davidson v. Cannon, a case decided on the same day as Daniels, the Court held that "the protections of the Due Process Clause, *whether procedural or substantive*, are just not triggered by lack of due care." 474 U.S. 344, 348, 106 S. Ct. 668, 671 (1986) (emphasis added); see Lewis, 523 U.S. at 849, 118 S. Ct. at 1718 (noting that Cannon "clarif[ies] that Daniels applies to substantive, as well as procedural, due process").

On the authority of Daniels and Cannon, we hold that mere negligence or inadvertence on the part of a law enforcement official in failing to turn over Brady material to the prosecution, which in turn causes a defendant to be convicted at a trial that does not meet the fairness requirements imposed by the Due Process

29

Clause, does not amount to a "deprivation" in the constitutional sense. Thus, a

negligent act or omission cannot provide a basis for liability in a § 1983 action

seeking compensation for loss of liberty occasioned by a <u>Brady</u> violation.[11]


      C.      <u>Whether Porter Has Produced Evidence Sufficient to Show that</u>
                    <u>Fairbanks's Conduct in this Case was More than Merely Negligent</u>
                    <u>and that Fairbanks's Conduct Caused the</u> Brady <u>Violation</u>

Having established that a due process claim like Porter's will not give rise to

§1983 liability in the absence of some evidence of more-than-negligent conduct on

the part of the defendant-law enforcement official, we now consider whether Porter

has produced sufficient evidence to create a triable issue of fact with regard to

Fairbanks's culpability. We also consider whether Porter has shown an

"affirmative causal connection" between Fairbanks's conduct and the denial of due

process occasioned by the <u>Brady</u> violation.

      1.      <u>The Karcinski Report</u>

---

[11] We conclude below that the evidence in this case would, at best, support only an inference of mere negligence on the part of Fairbanks; therefore, like the Court in <u>Daniels</u>, we have no reason to consider whether, in the context of a claim like Porter's, "something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." <u>Daniels</u>, 474 U.S. at 334 n.3, 106 S. Ct. at 666 n.3. <u>See</u> <u>Wilson v. Northcutt</u>, 987 F.2d 719, 722-23 (11th Cir. 1993) (recognizing the question left open by <u>Daniels</u> and noting that "[b]ecause . . . the appellees' conduct did not rise to the level of gross negligence, we leave for another day the determination of whether gross negligence can support a § 1983 [due process] claim").

Regarding the Karcinski report, Porter's claim against Fairbanks fails for lack of causation. See Troupe, 419 F.3d at 1165. The causal chain relied upon by Porter to support his due process claim with respect to the Karcinski report is this: (1) Fairbanks did not give the report to the State Attorney's Office, (2) the State Attorney's Office therefore never had the report, (3) because the State Attorney's Office never had the report, it could not disclose it to Porter's defense, and (4) because the report was not disclosed to his defense, Porter was denied his due process right to a fair trial. A review of the record, however, conclusively demonstrates that the second link in Porter's causal chain is missing. The undisputed evidence shows that the Karcinski report was in fact in possession of the State Attorney's Office prior to Porter's trial in August 1988. Accordingly, the record makes plain that the report was turned over to the prosecution by Fairbanks or someone else, and thus any failure to disclose the report to Porter's defense prior to trial was necessarily caused by the prosecution, not Fairbanks.

Karcinski gave testimony at a deposition in February 1988, some six months before Porter's trial. The transcript of that deposition is part of the record in this case. Four individuals were present at the deposition: (1) Karcinski, (2) Carl Johnston, an Assistant State Attorney who covered the deposition for Mansfield, (3) McMillan, the Assistant Public Defender who handled Porter's defense for a

brief period of time during the discovery phase of the proceedings, and (4) a court reporter. At the time of the 1988 deposition, Karcinski was no longer employed by the Pasco County Sheriff's Office and, as a result, had not had an opportunity to review any police reports — including his own — in preparation for his testimony. The police report Karcinski prepared on the night of the attack is the only one he prepared in connection with the case. Karcinski has given undisputed deposition testimony in this case that he did not have a copy of his police report with him when he went into the 1988 deposition.

During questioning at the 1988 deposition, Karcinski had trouble remembering specific details about the information Young had given him at the gas station in the early morning hours following the attack. About halfway through the deposition, Johnston — the Assistant State Attorney — asked Karcinski: "Is that your report?" Karcinski responded affirmatively: "Uh-huh." Johnston then said to McMillan: "Do you want to give him an opportunity to review it?" To which McMillan responded: "That's fine with me." The parties then went off the record while Karcinski reviewed his report. Karcinski could not recall at his deposition in this case which of the two attorneys handed him the report; but it was one of them.

Back on the record, McMillan stated: "The ex-deputy has had a chance to review his report. . . ." McMillan then went on to ask Karcinski if, based on his

32

review of the report, he had anything further to add to his prior testimony regarding the information he gathered from Young. Karcinski testified that he remembered more of the details of the attack, but "[o]ther than that, I can't recall any other, you know, actual statements she had made. . . . [S]he was pretty much in a state of shock." Karcinski did not volunteer any information about the physical description of the attacker Young gave him at the gas station, which was included in the report. Instead, with regard to the description given by Young, Karcinski stated: "She had mentioned that it was dark, she was grabbed from behind, and that she did not get a good look at the person who, you know — ." Cutting Karcinski off, McMillan said he had no further questions, and the deposition concluded.

McMillan, at a deposition given in connection with this case, testified that he did not remember obtaining a copy of Karcinski's report before the 1988 deposition and that he did not remember reviewing the report while the deposition was underway. McMillan further testified that, if he had received or reviewed the report, he would have questioned Karcinski about the physical description Young gave him at the gas station — a description that, again, Karcinski failed to mention during the deposition. In the summary-judgment posture of this case, we assume McMillan is correct when he says that he never saw the Karcinski report. We must therefore assume that McMillan did not carry the Karcinski report into the 1988

33

deposition. That leaves Johnston as the only individual present who could have brought Karcinski's report to the deposition. Johnston has not given testimony in this case.

With respect to Porter's claim against Fairbanks, it is irrelevant whether or not McMillan ever saw a copy of the Karcinski report. To establish the "affirmative causal connection" between Fairbanks and the alleged constitutional violation, as required by Troupe, 419 F.3d at 1165, Porter would have to show both that Fairbanks withheld the Karcinski report from the prosecution and that the prosecution did not obtain the report from anyone else. The focus of our inquiry, then, is on whether the prosecution received the report. The transcript of the 1988 deposition — coupled with Karcinski's undisputed testimony that he did not carry the report to the deposition and our assumption that McMillan could not have done so either (because he never saw it) — makes clear that Johnston, the Assistant State Attorney, had possession of the report at the time of the deposition. Given the undisputed state of the record, it is impossible to say that any act or omission by Fairbanks caused the prosecution not to receive the Karcinski report. It is therefore impossible to say, with respect to this report, that Fairbanks's conduct caused the Brady violation. Rather, it appears that the prosecution had possession of the report, but that somewhere along the way the report failed to reach the defense,

34

thus giving rise to the Brady violation.

>2. The Hendrickson Report

Porter argues that the following facts would permit a reasonable juror to infer that Fairbanks intentionally withheld the Hendrickson report from the prosecution:

> (1) that Detective Fairbanks had the Hendrickson . . . report[] before the Michael Porter trial in 1988; (2) that Detective Fairbanks was required by PCSO policy to turn over [that report] to the State Attorney's Office; (3) that Detective Fairbanks understood he was required by PCSO policy to turn over [that report] to the State Attorney's Office; and (4) that [the Hendrickson report] w[as] in fact never turned over to the State Attorney's Office.

Porter Br. at 25. We disagree. We have meticulously combed the record and have found no evidence — beyond the evidence as summarized in Porter's own brief and beyond his conclusory allegations — to bolster Porter's assertion that Fairbanks intentionally withheld the Hendrickson report from the prosecution.

The strongest permissible inference that one might conceivably draw from these facts is that the Hendrickson report failed to reach the State Attorney's Office on account of some negligent act or omission properly attributable to Fairbanks, the official charged with the duty to deliver the police reports to the prosecution. Even that inference, however, is doubtful given how little anyone involved with the investigation and prosecution of this case can remember about the circumstances

35

surrounding the handling of this report.[12]  Even assuming that the Hendrickson

report was misplaced by negligence in Fairbanks's office, however tenuous that

assumption, there is no evidence of ill-will or motive on the part of Fairbanks.

Indeed, there is absolutely no evidence from which a jury could reasonably infer

intent to withhold, recklessness, or anything more than mere negligence.  Because

Porter is unable to show that the Hendrickson report failed to reach the State

Attorney's Office as a consequence of some more-than-negligent act or omission

on the part of Fairbanks, we must reject his due process claim.

## IV.  CONCLUSION

We conclude that Porter has failed to create a genuine issue of material fact

---

[12] Indeed, there is considerable doubt that Fairbanks or his office was even the cause of the defense's non-use of the Hendrickson report.  The fact that the Hendrickson report was not located in the public defender's file in 1994 — six years after Porter's first trial, when Fulgieri conducted his investigation in connection with Porter's federal habeas petition — is of little probative value, because the public defender's file contained *no* police reports at all, and Porter has never alleged that he did not receive for use at trial Fairbanks's report, which, incidentally, contains a description of Young's attacker at odds with the description Young gave Karcinski immediately following the attack.  Assuming that the Hendrickson report never reached Porter's trial counsel, Dehnart, the possible causes are several — the report could have been misplaced in Fairbanks's office, in the prosecutor's office, or in the office of Porter's initial defense attorney, McMillan, who conducted pretrial discovery, but whose representation of Porter was interrupted three to four weeks before trial by a serious illness.  Moreover, we know that another police report that the defense did not get, the Karcinski report, was in fact in the possession of the prosecutor's office at least six months before trial.  There is absolutely no evidence suggesting that the misplacement of the Hendrickson report occurred in Fairbanks's office, rather than in one of the other two.  Although we doubt Porter has adduced sufficient evidence on causation with respect to the Hendrickson report, we need not reach that question in light of our conclusion that, even assuming Porter could demonstrate causation, there is no evidence that Fairbanks engaged in any more-than-negligent conduct.

on his due process claim against Fairbanks.  Because Porter's claim against Fairbanks fails on the merits, we need not reach the second prong of the qualified-immunity analysis.  See Ferraro, 284 F.3d at 1194; see also Saucier, 533 U.S. at 201, 121 S. Ct. at 2156.  Our conclusion that Fairbanks did not violate Porter's due process rights means that Porter's claims against White fail.  See Los Angeles v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571, 1573 (1986); see also Rooney v. Watson, 101 F.3d 1378, 1381-82 (11th Cir. 1996); Vineyard v. County of Murray, Ga., 990 F.2d 1207, 1211 (11th Cir. 1993).  Accordingly, the judgment of the district court is affirmed.

AFFIRMED.