Christopher M. JONES, Plaintiff,

v.

The CITY OF COLLEGE PARK, GEORGIA, a municipal corporation, et al., Defendants.

Civil No. 1:05–CV–1797–JTC.

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 28, 2007.

Arch Y. Stokes, John R. Hunt, Shea Stokes Carter, College Park, GA, for Plaintiff.

Clay Colvin Mingus, Elarbee Thompson Sapp & Wilson, Atlanta, GA, Kelly Michael Hundley, Henderson & Hundley, PC, Decatur, GA, for Defendants.

### *ORDER*

JACK T. CAMP, District Judge.

Pending before the Court are the Magistrate Judge's Report and Recommendation [# 130] and Defendants' Objections [# 131]. This action involves allegations that Defendants discriminated against Plaintiff on the basis of his race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981; violated Plaintiff's civil rights under 42 U.S.C. § 1983; and conspired to violate his rights under 42 U.S.C. § 1985(3). The Magistrate Judge recommends that the Court grant Defendants' motion for summary judgment [# 77] as to the § 1985(3) claim and deny the motion as to the remaining claims.

## I. Standard of Review

Under 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72, the Court has conducted a careful, *de novo* review of the portions of the Magistrate Judge's Report and Recommendation to which Defendants objected. The Court has reviewed the remainder of the Magistrate Judge's Report and Recommendation for clear error.

## II. Analysis[1]

### A. Direct Evidence

 Defendants argue that Defendant Wyatt's and Jones's comments do not constitute direct evidence of discrimination. "Direct evidence" of discrimination is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir.2004) (quotation marks omitted). "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Id.* (quotation marks omitted). "If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Id.* A classic example of direct evidence is "a management memorandum saying, 'Fire [plaintiff]-he is too old.'" *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir. 1990).

Despite this seemingly clear definition of direct evidence, the Eleventh Circuit has held that a number of statements which do not appear to fit neatly into that definition were direct evidence of discrimination.

See, *e.g., Caban–Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir.1990) (plaintiff's testimony that the employer said he "needed a black director" was direct evidence); *E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920, 923 (11th Cir.1990) (managers' statements that "if it was his company, he wouldn't hire any black people" and "you people can't do a—thing right" were direct evidence); *E.E.O.C. v. Beverage Canners, Inc.,* 897 F.2d 1067, 1068 n. 3 & 1072 (11th Cir.1990) ("racially hostile remarks by managers and supervisors" were direct evidence); *Walters v. City of Atlanta,* 803 F.2d 1135, 1141 (11th Cir.1986) (memorandum requesting new list of candidates because the current list "does not include any minority group representation" was direct evidence); *Miles v. M.N.C. Corp.,* 750 F.2d 867, 874–75 (11th Cir.1985) (manager's statement that he did not hire blacks because " '[h]alf of them weren't worth a shit' " was direct evidence); *Lee v. Russell County Bd. of Ed.,* 684 F.2d 769, 772, 774–75 (11th Cir.1982) (school board member's statements that he "was concerned about getting a greater 'white presence' " and "was pleased" that a newly hired teacher was white were direct evidence).

While discussing the above-cited cases, among others, the Eleventh Circuit stated that it "has found direct evidence where actions or statements of an employer reflect a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir.1997) (quotation marks and alteration omitted). As the Magistrate Judge pointed out, the Eleventh Circuit has held that "a statement that members of a racial minority in gen-

---

1. The Magistrate Judge set forth the relevant background at pages 1308–13 of the Report

and Recommendation. Thus, the Court will not repeat it in this Order.

eral or women in general are simply not competent enough to do a particular job would seem to be a classic example of direct evidence." *Haynes v. W.C. Caye & Co.*, 52 F.3d 928, 931 (11th Cir.1995). In contrast, where an employer's statement involving race does not relate to the plaintiff's job, employment, or the hiring process or is made by someone other than the decision-maker, the Eleventh Circuit has typically held that the statement does not constitute direct evidence. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1298–1300 (11th Cir.1999) (discussing cases).

■■■ Defendants argue that because Defendant Wyatt's and Jones's comments did not explicitly relate to "the decisional process or an explanation of the decision not to renew Plaintiff's employment," (Defs.' Objs. at 5), they do not amount to direct evidence. However, as the plethora of cases cited above demonstrate, direct evidence is not as narrow as Defendants suggest. Wyatt's statement that Plaintiff was not the right person to represent College Park's development because he was white and his asking how Plaintiff as a white development director could relate to a predominately African–American city and Jones's statement that she thought it would be difficult or impossible for Plaintiff to relate to the needs of her black constituents are akin to the statements made in *Caban–Wheeler* and *Lee,* where employers expressed preferences for employees of a specific race. *See Caban–Wheeler,* 904 F.2d at 1555; *Lee,* 684 F.2d at 772, 774–75. The statements were not

as crass or uncouth as those in *Alton Packaging, Beverage Canners,* or *Miles,* but seem to evoke a similar sentiment, that Plaintiff was unfit for his position because he was white. *Cf. Haynes,* 52 F.3d at 931. The cases cited by Defendants are inapposite, as they involve statements unrelated to employment or made by non-decision-makers. *See Johnson v. Nicholson,* No. 05–13259, 2005 WL 3199278, at *3 (11th Cir. Nov.30, 2005) (comment unrelated to employment); *Scott v. Suncoast Beverage Sales, Ltd.,* 295 F.3d 1223, 1227–28 (11th Cir.2002) (comment made two years earlier and unrelated to employment decision).

■■■ Accordingly, the Court **OVER-RULES** Defendants' objection.[2]

### B. Pretext

■■■ Defendants state that Plaintiff was terminated for disrespectful or unprofessional behavior. Defendants argue that Plaintiff has failed to show that their legitimate nondiscriminatory reason is a pretext for discrimination. To survive summary judgment, a plaintiff must show that the defendant's proffered reason is a pretext for discrimination, "either directly, by persuading the court that a discriminatory reason more than likely motivated the employer, or indirectly, by persuading the court that the proffered reason for the employment decision is not worthy of belief." *Hall v. Ala. Ass'n of Sch. Bds.,* 326 F.3d 1157, 1166 (11th Cir.2003). A plaintiff's "evidence must reveal such weaknesses, implausibilities, inconsisten-

---

**2.** Neither party objects to the Magistrate Judge's finding that none of Phillips's statements constituted direct evidence. Phillips stated "Can't anybody but this white boy [Plaintiff] do this?" and commented that the city needed more African–American department heads to reflect its 80% black demo-

graphics. These statements appear to be direct evidence of discrimination under the cases cited above. However, the Court does not find the Magistrate Judge's decision not to classify them as direct evidence to be clearly erroneous.

cies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir.2005) (quotation marks omitted).

■ As the Magistrate Judge noted, Plaintiff has presented sufficient evidence to create a genuine issue of material fact that Defendants' nondiscriminatory reason is a pretext for discrimination. Defendants Wyatt, Jones, and Phillips all made statements, detailed above, generally expressing Plaintiff's unfitness for his position due to his race or a desire to replace Plaintiff with an employee of another race. Those statements are evidence of pretext. *See Vessels*, 408 F.3d at 771. Plaintiff also produced evidence suggesting that Phillips's actions at the November 2003 council meeting were not motivated by Plaintiff's behavior, but to assuage the appearance that a white development director was "running the show" at a council meeting. (Pl.'s Dep. at 26.) This evidence, coupled with the evidence Plaintiff presented indicating that employees recommended for termination were given a probationary period before actually being terminated, whereas Plaintiff was not, would allow a jury to find that Defendants' stated nondiscriminatory reason was unworthy of credence. *See Vessels*, 408 F.3d at 771.

Accordingly, the Court **OVERRULES** Defendants' objection.

### C. Qualified Immunity

As set out in the Report and Recommendation and briefly discussed above, a genuine issue of material fact exists as to whether Defendants violated Plaintiff's constitutional rights. While the Magistrate Judge correctly found the right to be free of racial discrimination in the workplace to be clearly established, the inquiry is more fact-specific: in 2004, would a reasonable city council member have known that terminating an employee under the facts of this case violated clearly established law. *See Stanley v. City of Dalton*, 219 F.3d 1280, 1294 (11th Cir.2000). "This objective formulation shields [Defendants] from suit, even though [they] in fact committed constitutional violations, provided that a [city council member] reasonably, albeit mistakenly, could have believed that his [or her] conduct was lawful. In other words, a [government official] can guess wrong about the constitutionality of his conduct, provided the mistake is a reasonable one." *Id.*

■ "[T]he presence of a jury issue about a defendant's improper intent does not necessarily preclude qualified immunity." *Id.* at 1295. "A defendant is entitled to qualified immunity under [this] rationale only where, among other things, the record indisputably establishes that the defendant in fact was motivated, *at least in part*, by lawful considerations." *Id.* at 1296. The Eleventh Circuit has described this inquiry as "essentially only an evidence sufficiency issue in the guise of a question of law." *Gardner v. City of Camilla*, 186 Fed.Appx. 860, 863 (11th Cir. 2006). In *Gardner*, the district court found genuine issues of material fact to exist regarding whether the defendant's proffered nondiscriminatory reason was a pretext for discrimination. *Id.* at 864. The Eleventh Circuit noted that "the district court, in essence, found that the record did not indisputably establish the existence of a nondiscriminatory motive" and, therefore, the defendant was not entitled to qualified immunity. *Id.*

■ In this case, Plaintiff has produced evidence disputing whether the alleged acts of disrespectful or unprofessional behavior occurred and, at least in the case of Phillips, whether those acts were the true motivation for the decision to terminate Plaintiff. Thus, the record does not establish indisputably that Defendants were motivated, at least in part, by lawful considerations when they fired Plaintiff. *Cf. Stanley*, 219 F.3d at 1296–97 (plaintiff did not dispute the occurrence of the behavior cited by defendant as reasons for his termination; plaintiff's protected activity occurred four years prior to his termination).

Accordingly, Defendants are not entitled to qualified immunity, and the Court **OVERRULES** their objection.

### III. Conclusion

For the foregoing reasons, the Court **OVERRULES** Defendants' Objections [# 131] and **ADOPTS** the Magistrate Judge's Report and Recommendation [# 130] as the opinion of this Court. Therefore, the Court **GRANTS** in part and **DENIES** in part Defendant's motion for summary judgment [# 77]. The Court **GRANTS** the motion as to Plaintiff's § 1985(3) claim and **DENIES** the motion as to Plaintiff's remaining claims.

### *FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE*

E. CLAYTON SCOFIELD III, United States Magistrate Judge.

### I.

#### *Introduction*

Plaintiff, Christopher M. Jones, filed the instant action on July 8, 2005, charging Defendants, the city of College Park, Tracey Wyatt, Charles E. Phillips, and Cynthia L. Jones, with race discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, and 42 U.S.C. § 1981; civil rights violations under 42 U.S.C. § 1983; and conspiracy to violate civil rights under 42 U.S.C. § 1985(3). Plaintiff claims he was discriminated against on the basis of his race (white) when he was terminated from the position he held as development director of the city of College Park. This matter is presently before the Court on Defendants' motion for summary judgment on all claims. [Doc. 77]. For the reasons stated herein, this Court recommends that Defendants' motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART.**

### II.

#### *Factual Background*

■ When evaluating the merits of a motion for summary judgment, the Court must view the evidence and factual inferences in a light most favorable to the non-moving party. *Frederick v. Sprint/United Mgt. Co.*, 246 F.3d 1305, 1309 (11th Cir. 2001); *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir.1993). Applying the above legal standard, the Court derives the following facts from the parties' statements of facts and from the record as a whole:

The city of College Park is a corporate body chartered by the General Assembly of the state of Georgia. (Def's SMF ¶ 29). College Park's city council consists of four council members and the mayor, Mayor Longino, who presides over council meetings and only votes in the event of a tie. (Pl's SMF ¶ 2). In 1998, Plaintiff, a white

male, was hired by the Mayor and city council of College Park as Main Street Coordinator. (Def's SMF ¶¶ 5, 6); (Pl's SMF ¶ 1). When Plaintiff was hired, Charles E. Phillips ("Phillips"), a black male, was the only individual Defendant who was then a member of the city council of College Park. (Pl's SMF ¶ 2). In 1998, Phillips supported hiring Plaintiff as the Main Street coordinator. (Def's SMF ¶ 76). The other two individual Defendants had not yet been elected to the council. (Pl's SMF ¶ 2).

In April 2001, the Mayor and city council promoted Plaintiff to director of commercial and industrial development ("development director") for the city of College Park. At the time of Plaintiff's promotion, Phillips was still the only individual Defendant who was on the city council. (Pl's SMF ¶ 12). In 2001, Phillips supported promoting Plaintiff to development director. (Def's SMF ¶ 77). As development director, Plaintiff was employed on an at-will basis pursuant to a one-year renewable contract. (Def's SMF ¶ 7). He was the highest ranking employee in the development department and supervised one employee, Allan Lane. (Def's SMF ¶¶ 10, 11).

Plaintiff asserts that when he was seeking an assistant to supervise a development program for Old National Highway, he narrowed the candidates down to two people, a white woman and a black man, Lane. (Pl. Dep. at 82). Plaintiff testified that Phillips only wanted to meet with Lane, the African–American, and Lane was the person hired by the city, even though Plaintiff preferred the female candidate and considered her better qualified. (Pl. Dep. at 86).

As Main Street coordinator and later as development director, Plaintiff received recognition and awards for his work, and he also obtained substantial federal and regional grants for the city's development. (Plaintiff Affd. ¶¶ 4–5, 7, 12–13). Plaintiff asserts that he brought numerous businesses, mixed-use developments, and residential developments to College Park during his tenure there, contributing to College Park's economic renaissance. (Pl Affd. ¶¶ 6, 9–12); (Kennedy Dep. at 26, 42). Plaintiff asserts that his performance reviews were always highly favorable, and he consistently received top ratings for his communication skills, customer service, public relations, and professionalism. (Pl. Dep. at 222); (Exhs. 7, 8)[Doc. 93].

Defendant Cynthia Jones ("Jones"), a black female, was elected to the city council in November 2001. (Pl's SMF ¶ 21). She served on the city council from January 1, 2002, to December 31, 2005. (Pl's SMF ¶ 21). Following Jones's election, Plaintiff had a conversation with her about development in which she questioned his ability, as a white development director, to understand the development needs of College Park's African–American population. (Pl. Dep. at 39). Jones testified that when she first joined the Council, she overheard Plaintiff repeating hearsay to the effect that her seat on the Council had been "bought." (Jones Dep. at 45–46, 59). Plaintiff denies that he ever said this, or made any other inappropriate statements about Jones or her supporters. (Pl. Affd. ¶¶ 19, 20).

Plaintiff's contract came up for renewal in April 2002 and April 2003. (Pl's SMF ¶ 26). On both occasions, it was renewed without comment. (Pl's SMF ¶ 26). On both occasions, Defendants Jones and Phillips were two of the four members of city council. (Pl's SMF ¶ 26).

In November 2003, Tracey Wyatt ("Wyatt"), a black male, ran for and was elected to the city council. (Pl. Dep. 190). Plaintiff asserts that in Wyatt's 2003 campaign for city council, Wyatt campaigned on a racial platform, namely that he would make sure College Park had a predominantly black city government. (Pl. Dep. at 189–90). Plaintiff testified that Wyatt, Jones, and Phillips all had meetings at City Hall, including prayer meetings, where they stated that it was "their time" to take over College Park. (Pl. Dep. at 185–86). Plaintiff asserts that race was a big factor in the 2003 election. (Pl. Dep. at 185–86). Philip Coleman, who in 2003 was president of the board of directors of College Park's neighborhood association, testified that, in a meeting with Wyatt before the election, Wyatt stated that one of his campaign promises was to replace Plaintiff as development director. (Coleman Dep. at 9–12, 31). According to Coleman, Wyatt also stated he had concerns that College Park's development advantaged higher-class whites at the expense of low-income blacks. (Coleman Dep. at 9–12, 31). In this meeting, Wyatt stated that College Park needed more black department heads. (Coleman Dep. at 15).

Plaintiff testified that Joe Kearns, Wyatt's campaign manager, came into Plaintiff's office and told him that when Wyatt was elected, Plaintiff "needed to dust off [his] resume," because, as a white department head, he would not be retaining his position after the election. (Pl. Dep. at 195). Kearns also told him that he had done a good job and asked him if there was anywhere else he was interested in working. *Id.* Plaintiff replied that he was not interested in changing positions. *Id.*

Also in November 2003, Plaintiff and Council Member Phillips had a public disagreement in a city council meeting. (Pl. Dep. at 25–26). Witnesses at this meeting have given different versions of events and exactly what happened is disputed.[1] *See, e.g.,* (Pl. Dep. at 25–29); (Miller Dep. at 86–87); (A. Gravitt Dep. at 37–39, Decl. at ¶¶ 4–6); (Phillips Dep. at 29–31); (Slider Dep. at 32–36). Plaintiff testified that Phillips became extremely angry when Plaintiff attempted to correct Phillips regarding information Phillips had misunderstood from development documents Plaintiff had provided to the council members. (Pl. Dep. at 29); (Gravitt Dep. at 37–39, Decl. at ¶¶ 4–5). According to Plaintiff, Phillips publicly threatened to beat him up. (Pl. Dep. at 29). Plaintiff alleges he remained respectful throughout. (Pl. Affd. ¶ 25); (Gravitt Decl. ¶ 6).

Phillips, on the other hand, testified that Plaintiff was blatantly disrespectful to him in the meeting. (Phillips Dep. at 62). Phillips and J. Scott Miller, the former city manager of College Park, testified that Plaintiff stormed out of the building, complaining that Phillips needed to get off his back or stop riding him. (Phillips Dep. at 31); (Miller Dep. at 86). Plaintiff testified that he left briefly to retrieve some relevant paperwork and then, after returning, remained in the meeting until the discussion about development concluded. (Pl. Affd. ¶ 25); (Pl. Dep. at 27–28); (A. Gravitt Affd. ¶ 6).

---

1. College Park city council meetings are typically taped and transcripts are made. *See, e.g.,* (Slider Dep. at 15–24). Plaintiff asserts that the written minutes for the meeting in which Phillips threatened to beat him up do not exist and the tape has been destroyed. (Pl. Dep. at 125–26, 130). Plaintiff further asserts that Phillips routinely would go to the city clerk's office and ask her to edit the minutes, and that Plaintiff had overheard Phillips make such a request on one occasion. (Pl. Dep. at 126).

After the meeting was over, Plaintiff went to Phillip's office to apologize. (Pl. Dep. at 25–26, 30–31). Plaintiff apologized not because he felt culpable for the disagreement, but because it was professionally courteous and he knew that apologizing would be the only way to make headway with Phillips. (Pl. Dep. at 27). Phillips responded by thanking him for his apology and also apologizing, but then he stated he had to make an example out of Plaintiff at the meeting. (Pl. Dep. at 32). Phillips stated that he could not have a "white development director" appearing to run the show or to disagree with Phillips at a meeting where Phillips's key constituents were present. (Pl. Dep. at 25–26, 32–34). Plaintiff also testified that in past conversations with Phillips, Phillips had stated that College Park was predominantly African–American and the city needed more African–American department heads. (Pl. Dep. at 26).

After Wyatt assumed his seat on the council, he attended a mandatory meeting with the city manager and all the department heads, including Plaintiff. (Pl. Dep. at 168). Wyatt began the meeting by attacking Plaintiff, stating that Plaintiff should not represent a predominantly black city and that he believed Plaintiff had taken bribes from developers.[2] (Pl. Dep. at 168–69). During this meeting, Wyatt stated that he would go only to Allan Lane for information about development. (Pl. Dep. at 173–74).

Wyatt did indeed meet with Lane, who oversaw only Old National Highway, about development, but refused to meet with Plaintiff about development in College Park. (Pl. Dep. at 155–56, 182–83). Wyatt would ignore his requests for meetings, even in-person requests, and simply look at him and walk away. (Pl. Dep. at 156). On one occasion, Wyatt agreed to meet with him. (Pl. Dep. at 42–43). Wyatt asked him how he chose developers, and Plaintiff replied that he chose developers who could finance plans in line with the vision for the city, and that race was not a factor. (Pl. Dep. at 43). Wyatt asked how a white development director could relate to a city in development that was predominantly African–American. (Pl. Dep. at 44–45). Wyatt also asked if Plaintiff were interested in any other positions in the city, other than development director, and Plaintiff said no. (Pl. Dep. at 45, 53). Wyatt also asked if Plaintiff was a civil service employee or if he had a contract. (Pl. Dep. at 52). In January 2004 and February 2004, Plaintiff had conversations with Wyatt in which Wyatt told him that he was not the right person to represent College Park development because he was white. (Pl. Dep. at 190).

Early in 2004, during a workshop session of the city council, Phillips stated, "Can't anybody but this white boy do this?" with regard to development on Main Street. (Duncan Decl. ¶ 3). Phillips also stated that the city needed more African–American department heads to reflect its 80% black demographics. (Duncan Decl. ¶ 4).

In the Spring of 2004, Plaintiff went to a development meeting at an apartment complex in Jones's ward. (Pl. Dep. at 209). The meeting went very well, and he listened to the people's needs and addressed issues of noise and environment around the complex. (Pl. Dep. at 209–10).

---

**2.** Plaintiff asserts that, following the accusations of bribery, he offered to, and did, bring in copies of all the checks from his home renovation and all his restaurant receipts to prove that the allegations were false. (Pl. Dep. at 169–70).

Afterwards, Jones questioned how Plaintiff could relate to her black constituents and stated that she thought it would be difficult or impossible for him to do so. (Pl. Dep. at 210). Jones also made comments during council meetings expressing a preference for African–Americans in hiring and development projects, repeatedly requesting that Plaintiff use only African–American developers, which he would not agree to do. (Pl. Dep. at 67–68, 180, 201–02, 212–13). On one occasion, upon being informed that one of the developers Plaintiff was working with was a minority Indian woman, Jones stated that she wanted African–American minorities and that she was "sick and tired" of plaintiff not using African–American developers. (Pl. Dep. at 202).

It was considered a common courtesy, and an unwritten policy, that whenever a council member met with a developer, they would call the development director to participate. (Pl. Dep. at 161–62). Wyatt and Jones, however, frequently met with developers without informing Plaintiff. *Id.* After such meetings, they would inform Plaintiff that they wanted him to use the developer they had met with, without his having screened the developer, met with him, or qualified him. *Id.* Plaintiff testified that each of the developers in those cases was African–American.[3] *Id.*

During one city council meeting, the council members discussed what they could do to increase minority participation in contracting. (A. Gravitt Dep. at 85–86). The city council members asked the city attorney about their proposals, and the city attorney informed them that most of

the things they had asked about doing to increase minority participation were unlawful. (A. Gravitt Dep. at 86–87). Phillips responded, "Well, let's just keep on doing it until somebody calls us on it." *Id.*

Alan Gravitt had conversations with council member Wyatt in which Wyatt attacked Plaintiff's performance in ways that made no sense to Gravitt and that Mr. Gravitt believed to be pretextual, to cover up racial animosity. (A. Gravitt Dep. at 19–22, 29–32). For example, Plaintiff alone was criticized for the slow growth of the Old National area, even though that area was also Allan Lane's responsibility, and Lane did not have responsibility for any other areas. (A. Gravitt Dep. at 21). Gravitt also heard Wyatt state that the city was 80 or 85% black, and that he did not feel the city's employees represented that racial makeup. (A. Gravitt Dep. at 34–35).

The Mayor and Council discussed Plaintiff's employment in an executive session on April 19, 2004. (Def's SMF ¶ 12). At that time, Plaintiff was away on vacation, but the city manager, who had a copy of Plaintiff's performance evaluation, had assured him prior to his departure that the renewal of his contract had been "taken care of." (Pl. Affd.¶ 17). During the April 19 session, Defendants stated that Plaintiff had behaved disrespectfully toward them, although they did not provide any specific examples of disrespect. (Longino Dep. at 147–48). Defendants later elaborated that they were referring to Plaintiff's "blatantly disrespectful" behavior at the November 2003 meeting; to Plaintiff's alleged insistence that Wyatt not meet with developers

---

**3.** Wyatt asserts that Plaintiff stated that Wyatt could not meet with developers out of Plaintiff's presence or without informing Plaintiff. (Wyatt Dep. at 80–81). Plaintiff asserts that

he did not insist that they meet with him. (Pl. Dep. at 165). On Defendants' motion for summary judgment, the facts are taken in the light most favorable to Plaintiff.

outside his presence; and to Plaintiff's alleged statements about Jones buying her seat on the council. (Phillips Dep. at 62); (Wyatt Dep. at 81); (Jones Dep. at 45–46, 59). Plaintiff asserts that none of the instances of disrespect raised by Defendants occurred. (Pl. Affd. ¶¶ 19–25). Either Mayor Longino (white male) or council member Slider (white male) proposed that, instead of terminating Plaintiff, he be given a probationary period in which to improve, which was a standard practice with unsatisfactory department heads and city employees. (Slider Dep. at 151–55); (Longino Dep. at 149–50); (Miller Dep. at 139–40). Defendants were not willing to entertain the proposal, and it was rejected without much discussion. (Longino Dep. at 149–50); (Slider Dep. at 152–53). Council members Phillips, Wyatt, and Jones voted not to renew Plaintiff's employment at the meeting of April 19, 2004. (Def's SMF ¶ 27).

Later in 2004, after Plaintiff's nonrenewal, the Mayor and council rejected a black candidate recommended for development director by the city manager, Scott Miller. (Def's SMF ¶ 74). During 2004, the Mayor and council also unanimously approved renewing the employment contracts of the white finance director, the white director of the Georgia International Convention Center, the white power department director, and the white personnel director. (Def's SMF ¶¶ 31, 34, 38, 46). In the case of the white personnel director, the council rejected the city manager's recommendation that he be terminated. (Def's SMF ¶ 72). The Mayor and council also unanimously hired a black chief building inspector and a black public information officer,

and they unanimously appointed a white interim fire chief and a white interim city manager. (Def's SMF ¶¶ 35, 37, 40, 47).

On March 21, 2005, the Mayor and city council unanimously hired Roderick Gilbert, an African–American, as development director, filling Plaintiff's former position. (Def's SMF ¶ 54). Inga Kennedy, an urban planner with Planners for Environment Quality and the president of the Old National Merchants Association, had a meeting with Phillips and Wyatt after Plaintiff's termination. (Kennedy Dep. at 6–7, 10, 45–48). She expressed concerns about development after Plaintiff's departure, and Wyatt and Phillips informed her that they had hired a new development director and that he was an African–American. (Kennedy Dep. at 49–50). She gathered from Phillips's statements that they had specifically sought an African–American for the position and that they expected the Old National Merchants Association would be impressed with that choice. (Kennedy Dep. at 50, 58–59, 66).[4]

### III.

#### Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir.1998). A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (quoting *Anderson v. Liberty Lobby,*

---

4. Defendants, however, assert that there was no pressure to replace Plaintiff with a black development director, and that they merely sought the most qualified person. (Miller Decl. ¶ 4).

*Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The substantive law applicable to the case determines which facts are material. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

The moving party bears the initial burden of showing the court "the basis for its motion and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Four Parcels,* 941 F.2d at 1437, (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986)). If the moving party fails to discharge this initial burden, then the motion must be denied. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116 (11th Cir.1993) (citing *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991)). Once this burden is met, however, the non-moving party must then "go beyond the pleadings and ... designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (citing Fed.R.Civ.P. 56(e)) (internal quotations omitted).

### IV.

### *Discussion*

### A. The Law Applicable to Plaintiff's § 1981, § 1983, and Title VII Claims

■ Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2 (a)(1). Section 1981 pro-

tects an individual's right to be free from racial discrimination in the "making, performance, modification, enforcement, and termination" of contracts, including contracts of employment. 42 U.S.C. § 1981. Section 1983, on the other hand, is not itself a source of substantive federal rights; rather, it "merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). Plaintiff seeks to use § 1983 to vindicate his rights under § 1981, and therefore his claims under § 1981 are merged into his § 1983 claim. *See Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (holding that § 1983 is the exclusive remedy against state actors for violations of rights conveyed by § 1981); *Butts v. County of Volusia,* 222 F.3d 891, 893 (11th Cir.2000).

■ The analysis or framework initially applied to determine whether a plaintiff has established a claim under Title VII and § 1983 is essentially the same. *See, e.g., Alexander v. Fulton County,* 207 F.3d 1303, 1314 n. 6 (11th Cir.2000) (noting that the substantive law and proof requirements are the same for Title VII and § 1983 claims); *Rice–Lamar v. City of Ft. Lauderdale,* 232 F.3d 836, 843 n. 11 (11th Cir.2000) (race and gender claims under Title VII and § 1981 use Title VII framework). Therefore, the following analysis will be equally applicable to Plaintiff's Title VII, § 1981, and § 1983 claims.

■ In a Title VII wrongful termination action, the plaintiff has the burden of persuading the factfinder that the defendant intentionally discriminated against him. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089,

1093–94, 67 L.Ed.2d 207 (1981). A plaintiff may establish a prima facie case of discrimination by presenting either direct or circumstantial evidence of discriminatory intent. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *accord Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989). When direct evidence of discriminatory intent is not available, a plaintiff may present circumstantial evidence from which an inference of intentional discrimination may be drawn. *Armstrong v. Flowers Hosp. Inc.,* 33 F.3d 1308, 1313 (11th Cir.1994). The basic framework for establishing a prima facie case relying on circumstantial evidence is set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The allocation of burdens and order of presentation and proof are as follows: (1) the plaintiff has the burden of establishing a prima facie case of discrimination or retaliation; (2) once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory, non-retaliatory reason for the action taken against the employee; and (3) the burden then shifts back to the plaintiff to raise a genuine factual question as to whether defendant's stated reason is mere pretext. *See id.; Richardson v. Leeds Police Dept.,* 71 F.3d 801, 805–06 (11th Cir.1995).

## B. Direct Evidence

Plaintiff alleges that the facts show direct evidence of racial discrimination. (Pl. Br. at 9) [Doc. 91]. Defendants assert that the only evidence of discrimination presented by Plaintiff is circumstantial. (Def. Reply Br. at 1–2)[Doc. 99].

▮ Direct evidence of discrimination is evidence which reflects "a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir. 2004); *Damon v. Fleming Supermarkets Of Florida,* 196 F.3d 1354, 1358 (11th Cir.1999)(quoting *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 641 (11th Cir.1998)). It is "evidence, that, if believed, proves the existence of a fact without inference or presumption." *Wilson,* 376 F.3d at 1086 (internal punctuation omitted)(citing *Burrell v. Bd. of Trs. of Ga. Military Coll.,* 125 F.3d 1390, 1393 (11th Cir.1997)). Evidence that "only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence." *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir.1997)(internal citations omitted). "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate ... will constitute direct evidence of discrimination." *Damon,* 196 F.3d at 1359 (citing *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081–82 (11th Cir.1990)).

Plaintiff has alleged that the following constitute direct evidence of racial discrimination:

(1) Statements by all three individual Defendants regarding the need to bring in predominantly or exclusively African–American contractors, developers, and employees.

(2) Phillips's statement, upon learning that many of the council's plans to increase minority contracting were illegal, "let's just keep on doing it until somebody calls us on it."

(3) Wyatt's campaign promise to replace Plaintiff as development director, in combination with his platform of increasing African–American presence and power in College Park government. (Pl. Br. at 9–10).

The Court will first consider Wyatt's campaign promises to replace Plaintiff and to increase African–American participation in College Park government. At the outset, the Court notes that these were separate promises, and that Wyatt did not promise to *fire* Plaintiff and replace him with an African–American.[5] These statements, therefore, are analogous to the statements in the Eleventh Circuit's decision in *Damon v. Fleming Supermarkets of Florida*, 196 F.3d 1354 (11th Cir.1999). In *Damon*, a new district manager fired or demoted five older, experience managers, including the plaintiff, and replaced them all with younger, less experienced managers. *Id.* at 1358. After the plaintiff's termination, the defendant told the plaintiff's replacement that "what the company needed was aggressive, *young* men . . . to be promoted." *Id.* at 1359 (emphasis in original). The Eleventh Circuit held the defendant's comment still required the Court to *infer* that the defendant's interest in promoting young men motivated his decision to terminate the older Plaintiff, and therefore it was merely circumstantial, not direct, evidence. *Id.* Similarly, Wyatt's campaign promises permit the inference that his interest in hiring African–Americans as department heads motivated his desire to terminate Plaintiff, a white department head, but they do not rise to the level of direct evidence.

 Next, the Court will consider Phillips's statement regarding the city's unlawful preference for minority contractors: "Let's just keep on doing it until somebody calls us on it." These remarks were not made in the context of Plaintiff's employment and, therefore, do not directly "correlate" to the complained-of action. *See Johnson v. Nicholson*, 2005 WL 3199278, *3 (11th Cir.2005); *Carter*, 132 F.3d at 641; *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1330 (11th Cir.1998) ("[R]emarks . . . unrelated to the decisionmaking process itself are not direct evidence of discrimination"). *Cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 1804, 104 L.Ed.2d 268 (1989) ((O'Connor, J., concurring) ("statements by decisionmakers unrelated to the decisional process itself" do not constitute direct evidence of discrimination)). Thus, this remark cannot be treated as direct evidence.

Finally, the Court will consider statements by all three individual Defendants expressing the need to bring in predominantly or exclusively African–American developers, contractors, and employees. Plaintiff has alleged that the Defendants, particularly Jones, frequently expressed a preference for African–American developers and contractors. *See* (Pl. Dep. at 26, 67–68, 180, 161–62, 201–02, 212–13). However, for the same reasons discussed above with respect to Wyatt's campaign promise, none of the Defendants' general statements about wanting African–American developers amount to direct evidence of a discriminatory motive for terminating Plaintiff.

There are, however, more explicit, direct statements on the record regarding Defendants' preference for African–American

---

5. Plaintiff characterizes Wyatt's campaign promise as one to replace Plaintiff with an African–American. (Pl. Br. at 10). Plaintiff has not, however, pointed to any facts in the record showing that Wyatt ever made that promise, as such. Wyatt's statements must be distinguished from those of Kearns, his campaign manager, who told Plaintiff that as a white department head he would lose his job after the election. "Remarks by non-decisionmakers . . . are not direct evidence of discrimination." *Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1105 (11th Cir.2001).

employees over Plaintiff. After taking office, Wyatt asked Plaintiff how a white development director could relate to a predominantly African–American city. (Pl. Dep. at 44–45). In January or February 2004, Wyatt told Plaintiff he was not the right person to represent College Park's development because he was white. (Pl. Dep. at 190). In the Spring of 2004, prior to Plaintiff's termination, Jones stated that she thought it would be difficult or impossible for Plaintiff to relate to the needs of her black constituents. (Pl. Dep. at 210). These statements by Wyatt and Jones were made in early 2004, and when Plaintiff's contract next came up for review in the Spring of 2004, he was terminated.

Wyatt's statement appears to meet the requirements of direct evidence. *See Earley*, 907 F.2d at 1081 (giving as an example of direct discrimination a memorandum saying "Fire Earley—he is too old"). Wyatt states that Plaintiff's membership in a protected class makes him "not right" for his job. This type of statement has been held to constitute direct evidence of discrimination. *See, e.g., Akouri v. Florida Dept. of Transp.*, 408 F.3d 1338, 1347–48 (11th Cir.2005); *Haynes v. W.C. Caye & Co.*, 52 F.3d 928, 930–31 (11th Cir.1995).

In *Akouri*, the plaintiff, who was Lebanese, asked his superior why a white man was promoted instead of him. *Akouri*, 408 F.3d at 1347–48. He was told that the employees he would have been managing were all whites, and they would not take orders from the plaintiff, especially if he spoke with an accent. *Id.* The Court held that the statement was direct evidence of discrimination. *Id.* at 1348. The statement in *Akouri* that a Lebanese man could

not successfully manage white employees is analogous to the statements made by Wyatt, that a white man could not fill the development needs of black city residents.

In *Haynes*, the defendant questioned the plaintiff about whether "a sweet little old lady could get tough enough" to manage collections. *Haynes*, 52 F.3d at 930. He also stated that he "felt a woman was not competent enough to do this job, but I think maybe you're showing me that you can do it." *Id.* The Eleventh Circuit held that this was direct evidence of discrimination. *Id.* at 931. "Indeed, a statement that members of a racial [group] or women in general are simply not competent enough to do a particular job would seem to be a classic example of direct evidence." *Id.* This classic example is also analogous to this case, where Wyatt and Jones stated that a white person like Plaintiff "was not right" for the position and that a white, like Plaintiff, could not relate to their black constituents.

Accordingly, the undersigned concludes that Plaintiff has produced direct evidence against two of the three individual Defendants, Wyatt and Jones, who voted in favor of Plaintiff's termination. Direct evidence has not, however, been adduced against Phillips. For that reason, the Court will examine the circumstantial evidence as well under the familiar McDonnell–Douglas burden-shifting framework.

### C. Plaintiff's Title VII claims against College Park[6]

 To establish a prima facie case of discriminatory termination in a circumstantial evidence case, the plaintiff must

---

**6.** Of the named Defendants, College Park alone may be held liable under Title VII as plaintiff's employer. Individual liability does not attach. *See Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir.2006)

show that she was (1) a member of a protected class, (2) qualified for the job, (3) terminated, and (4) was replaced by someone outside the protected class. *Cuddeback v. Florida Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir.2004). The undisputed evidence on the record shows that Plaintiff is a member of a protected class, as a Caucasian; that he was qualified for his job; that he was terminated; and that his replacement, an African–American, was outside his protected class. Indeed, Defendants do not argue that Plaintiff cannot make out a prima facie case of discrimination. Instead, Defendants argue that Plaintiff cannot create a genuine issue of material fact as to pretext. (Def. Br. at 12)[Doc. 77].

"After the plaintiff proves a prima facie case of discrimination, the defendant need only to produce evidence that there is a legitimate, non-discriminatory reason for the challenged employment action." *Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir.2002). "The presumption of discrimination is then rebutted and the employer is entitled to summary judgment unless the plaintiff proffers evidence sufficient to create a genuine issue of material fact that discrimination was actually the reason for the challenged action." *Id.*

In this case, Defendants have articulated a legitimate, nondiscriminatory reason, by stating that Plaintiff was terminated for "disrespectful" behavior. Therefore, to survive summary judgment, Plaintiff must provide evidence that creates a genuine issue of material fact that Defendant's articulated, nondiscriminatory reason is, instead, pretext for unlawful discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804–807, 93 S.Ct. 1817; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105

(2000)(finding that "plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence' ") (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997).

In reviewing Defendants' explanation, however, the Court cannot, in the absence of evidence of discrimination, usurp an employer's legitimate business judgment. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir.2000) (finding that "in making business decisions (including personnel decisions), the employer can lawfully act on a level of certainty that might not be enough in a court of law"). To make a determination of pretext, "the district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir.2005)(quoting *Combs*, 106 F.3d 1519, 1538).

In this case, Plaintiff has produced evidence calling into question the sincerity of Defendants' belief in the truth of the grounds they proffered for his termination. Namely, Plaintiff has produced evidence that Wyatt, whose election campaign Phillips and Jones participated in, intended to get rid of Plaintiff, as a white development director and department head, even before he was elected, and sought out reasons to do so. (Pl. Dep. at 185–90); (Coleman Dep. at 9–12); (A. Gravitt Dep. at 19–22, 29–32). Plaintiff has also produced evidence that Phillips's anger regarding the

November 2003 council meeting was motivated not by Plaintiff's behavior, but by a desire that his constituents see him not allowing a "white development director" to disagree with him or appear to run things. (Pl. Dep. at 25–26, 32–34). Phillips's alleged statements, "Can't anybody but this white boy do this?" referring to Plaintiff's job, and, with regard to unlawful racial preferences, "Well, let's just keep on doing it until somebody calls us on it," present circumstantial evidence that his actual reasons for terminating Plaintiff were racial. (Duncan Decl. ¶ 3); (A. Gravitt Dep. at 86–87).

Furthermore, statements by each of the Defendants about their preference for African–Americans as beneficiaries of the city's largess, in the form of development contracts, employment, and department head positions, are circumstantial evidence of discriminatory animus, supporting a finding of pretext. *See Vessels,* 408 F.3d at 771 (alleged statements by Defendants regarding desirability of having black employees in a school district serving a predominantly black population were evidence of pretext).

Plaintiff has also produced evidence that in every other case, except for Plaintiff's, where a development directors performed unsatisfactorily, he or she was provided a probationary period in which to improve. (Slider Dep. at 151–55); (Miller Dep. at 139–40). Indeed, Plaintiff produced evidence that the Defendants, who constituted a majority of the council, were not willing to discuss the probationary period and did not, in that meeting, specify what "disrespect" they claimed Plaintiff had committed. (Longino Dep. at 147–50); (Slider Dep. at 152–53). In sum, Plaintiff has produced evidence that, viewed in the light most favorable to him,

suggests that during the time leading up to and following Wyatt's Fall 2003 campaign and election, the Defendants expressed dissatisfaction with having a white development director and a racial preference for a black in the position. The first time Plaintiff's contract came up for review following Wyatt's election, which provided the three-person majority on the council necessary to terminate him, he was terminated. This is sufficient evidence to create a genuine issue of material fact as to pretext.

Accordingly, it is **RECOMMENDED** that summary judgment on Plaintiff's Title VII claims be **DENIED**.

## D. Plaintiff's § 1981/1983 Claims against College Park

A municipality will be liable for damages under § 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dept. of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality cannot be held liable merely because it employs the tortfeasor. *Respondeat superior* is not enough. *Id.* at 691–92, 98 S.Ct. 2018. In other words, the action must be officially adopted or promulgated by an official with final policymaking authority. *Pembaur v. Cincinnati,* 475 U.S. 469, 481–82, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

In this case, it is undisputed that Phillips, Jones, and Wyatt, as council members, were officials with final policymaking authority for the city. By voting not to renew Plaintiff's employment, they executed the decision that Plaintiff contends was discriminatory in this case. Therefore, the

city of College Park may be held liable under § 1983. Furthermore, as explained above in the discussion of Title VII liability, this case presents a genuine issue of fact regarding whether Plaintiff was terminated for discriminatory reasons. *See Alexander v. Fulton County,* 207 F.3d 1303, 1314 n. 6 (11th Cir.2000) (noting that the substantive law and proof requirements are the same for Title VII and § 1983 claims). Accordingly, for the same reason it is **RECOMMENDED** that the motion for summary judgment be **DENIED** with regard to Plaintiff's § 1983 claims against College Park.

### E. Plaintiff's § 1981/1983 Claims against the Individual Defendants and Qualified Immunity

For the same reasons outlined above, *supra* secs. IV.B. and IV. C, the Plaintiff has presented a genuine issue of fact with regard to his § 1983 claims against the individual Defendants for race discrimination under § 1981. They have, however, asserted qualified immunity.

 A government official who is sued under § 1983 may seek dismissal of the claims against him on the grounds that he is entitled to qualified immunity. *Gonzalez v. Reno,* 325 F.3d 1228, 1233 (11th Cir.2003)(citing *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). "Qualified immunity protects government official performing discretionary functions from civil trials (and from other burdens of litigation, including discovery) and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Foy v. Holston,* 94 F.3d 1528, 1532 (11th Cir.1996) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 817–819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

 When confronted with an invocation of qualified immunity, the Court must first decide the threshold issue of whether the defendant deprived the plaintiff of a constitutional right at all, before addressing whether a particular right is "clearly established." *Porter v. White,* 483 F.3d 1294, 1302 (11th Cir.2007) (citing *Brosseau v. Haugen,* 543 U.S. 194, 197, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004); *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). We proceed to the "clearly established" prong of the qualified-immunity inquiry only if a constitutional right would have been violated under the Plaintiff's version of the facts. *Porter,* 483 F.3d at 1303 (citing *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002)).

As discussed above, Plaintiff has alleged sufficient facts to show a violation of his right to be free from racial discrimination protected under § 1981. Therefore, the Court will turn to the question of whether the right in question is "clearly established."

 A right is "clearly established" if "its contours are sufficiently clear that a reasonable official would understand what he is doing violates that right." *Vaughan v. Cox,* 316 F.3d 1210, 1212 (11th Cir.2003)(quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). If the state of the law at the time the alleged violation occurred gave the Defendants "fair warning that their acts were unconstitutional," then they are not entitled to qualified immunity. *Holmes v. Kucynda,* 321 F.3d 1069, 1078 (11th Cir.2003)(internal punctuation omitted); *see also Anderson,* 483 U.S. at 640, 107 S.Ct. 3034 ("in the light of the preexisting law the unlawfulness must be apparent").

■ The right to be free of racial discrimination in the workplace is clearly established. *Alexander v. Fulton County,* 207 F.3d 1303, 1321 (11th Cir.2000); *Brown v. City of Fort Lauderdale,* 923 F.2d 1474, 1478 (11th Cir.1991). Therefore, the individual Defendants in this case are not entitled to qualified immunity. *See id.*

Accordingly, it is **RECOMMENDED** that Defendant's motion for summary judgment on the grounds of qualified immunity be **DENIED.**

### F. Plaintiff's § 1985 Claim

■ Section 1985 contains three subsections and in total proscribes five different types of conspiracies. See *Kush v. Rutledge,* 460 U.S. 719, 724, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983) (describing the different subsections and categories of conspiracies of § 1985). It appears from Plaintiff's complaint and his response to Defendants' motion for summary judgment that he brings his claims in this case under section 1985(3).[7] [Doc. 1]; [Doc. 91]. Defendants move for summary judgment on the grounds that Plaintiff's claim is barred by the intracorporate conspiracy doctrine.

The intracorporate conspiracy doctrine provides that: acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves.

*McAndrew v. Lockheed Martin Corp.,* 206 F.3d 1031, 1036 (11th Cir.2000) (en banc). Eleventh Circuit precedent has applied the intracorporate conspiracy doctrine to shield a public university from section 1985 liability in a civil conspiracy claim, finding that the university and its officials constituted a single legal entity that cannot conspire with itself to deprive a teacher of his civil rights. *See Chambliss v. Foote,* 421 F.Supp. 12, 15 (E.D.La.1976), *aff'd,* 562 F.2d 1015 (5th Cir.1977) (affirming on basis of district court's opinion), *cert. denied,* 439 U.S. 839, 99 S.Ct. 127, 58 L.Ed.2d 137 (1978). *See also Dickerson v. Alachua County Comm'n,* 200 F.3d 761, 767–68 (11th Cir.2000) (intracorporate conspiracy doctrine barred plaintiff's § 1985 claim against county jail employees for alleged deprivation of civil rights); *Taylor v. Alabama,* 95 F. Supp 2d. 1297, 1317–18 (M.D.Ala.2000) (applying intracorporate conspiracy doctrine to bar plaintiff's § 1985 claims against Alabama Department of Transportation employees for alleged gender discrimination, retaliation, and hostile work environment).

■ Plaintiff alleges that the intracorporate conspiracy doctrine does not apply because the individual Defendants conspired on their own behalf as individuals,

---

7. Section 1985(3) states, in relevant part:
 If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

**1322**

with a personal stake in the matter in the form of their individual racial animosity, and not on behalf of College Park. (Pl. Br. at 25–26). The "independent personal stake" exception to which Plaintiff refers has not, however, been adopted by the Eleventh Circuit. *Bryant v. Jones*, 464 F.Supp.2d 1273, 1288 (N.D.Ga.2006)(finding that the exception does not exist under current Eleventh Circuit law and that, even if it did, it would only apply to defendants with independent *economic* stake in the conspiracy); *see also Dickerson v. Alachua County Commission*, 200 F.3d 761, 770 (11th Cir.2000)(discussing the exception and declining to reach the issue of whether the exception will apply in this circuit). Accordingly, since all the alleged conspiring actors are employees whose acts are attributed to the city, the Court **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** with respect to Plaintiff's 1985 claim on the basis of the intracorporate conspiracy doctrine.

## V.

### Conclusion

In summary, it is recommended that Defendants' motion for summary judgment [Doc. 77] be **GRANTED in part** and **DENIED in part**. Specifically, it is recommended that it be **GRANTED** with respect to Plaintiff's § 1985 claims and **DENIED** with respect to Plaintiff's § 1981, § 1983, and Title VII claims.